UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.     Case No. 3:24-cr-87-MMH-SJH

JOSUE GARRIGA, III
   a/k/a "Sway"

### UNITED STATES' SENTENCING MEMORANDUM

In the Fall of 2023, Josue Garriga—then a detective for the Jacksonville Sheriff's Office—saw a child at church. Doc. 68 ¶ 8. He watched from afar and ensured they crossed paths again. One morning before church service started, he went behind a coffee station where the child volunteered and talked to her. Id. As parishioners arrived, under the coffee bar and out of sight, the defendant reached up the child's skirt and rubbed her vagina atop her underwear. Id. The pastor observed the defendant speaking with the child in a way the pastor thought inappropriate, and he attempted to intervene and end the relationship. The defendant was undeterred.

In the following weeks, using an undercover police account, he found the child's Instagram account and reached out to her. Doc. 68 ¶ 9. From there, he got the child's cell phone number, and then moved their communications to an end-to-end encrypted platform, making it so that copies of the messages could not be obtained by law enforcement through a search of the provider's servers. Id. For good measure, he then activated a feature that automatically deleted all messages exchanged between himself and the child on both of their phones after 24 hours—

destroying most records of their conversations.  Id.  The defendant knew from his law enforcement experience how to cover his tracks.  He communicated with the child victim on WhatsApp from October 2023 through March 2024.  Id. ¶¶ 11–16.  Through those six or so months, he requested nude photos of the child, and sent unsolicited nude photos of himself.  Id. ¶ 11.  He groomed her into showing herself masturbating and showering on video calls.  Id.  Indeed, her phone revealed over 120 completed Facetime calls with the defendant.  Id.

On several occasions the defendant drove his work vehicle to the child's neighborhood.  Id. ¶ 12.  In the dark of his car, the defendant made sexual contact with the child.  Id.  On March 6, 2024, the defendant lured the child into his work vehicle from a coffee shop where she was doing homework.  Id. ¶ 16.  He then physically restrained the child from exiting his work vehicle, finally allowing her to leave after she gave in to his badgering and kissed his penis.  Id. ¶ 16.

On March 7, 2024, the child attempted suicide.  Id. ¶ 6.  During that incident, her mother discovered the defendant's communications with her child.  Id.  The investigation began, and when police confronted the defendant about his relationship with the child, he lied.  Id. ¶ 17.  He portrayed his relationship as one of mentorship instead of sexual grooming.  Id.  But when law enforcement uncovered electronic evidence and interviewed witnesses, including the child victim, the truth came to light.  Now, having pled guilty, the Court is faced with the question of an appropriate sentence for the defendant.  Based on the facts and evidence of this case, the United

States submits that the only sentence sufficient but not greater than necessary is one within the sentencing guidelines.

I.     THE PSR PROPERLY SCORES THE TOTAL OFFENSE LEVEL

The Final Presentence Investigation Report (PSR) properly scores the base offense level and applies the appropriate enhancements. Doc. 68. The defendant does not dispute this calculation except to object to the two-level "vulnerable victim" adjustment pursuant to USSG § 3A1.1(b)(1). The government agrees with the probation officer that this enhancement is properly scored.

The adjustment is appropriate "when the defendant knew or should have known that a victim of the offense was a vulnerable victim." USSG § 3A1.1(b)(1). The commentary defines a "vulnerable victim" as "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." "The vulnerable victim enhancement applies when the defendant specifically targets his victims based on the victims' perceived vulnerability to the offense."

The Eleventh Circuit repeatedly has affirmed the application of the vulnerable victim enhancement when the victim possessed a mental, physical, or circumstantial condition that the defendant knew existed when committing the crime. See e.g., United States v. Kapordelis, 569 F.3d 1291, 1316, (11th Cir. 2009) (holding that vulnerable victim enhancement applied because the victim children in the offense

3

were asleep and otherwise nonresponsive when the defendant pulled down their underwear for the camera); United States v. Cooper, 926 F.3d 718, 740 (11th Cir. 2019) (affirming application of adjustment because the district court found the presentence report and trial evidence showed the victims were vulnerable because they spoke limited English and had no job, family, or friends in the United States, which allowed the defendant to coerce them into working for him); United States v. Lowe, 763 F. App'x 878, 879–80 (11th Cir. 2019) (holding that adjustment applied because the defendant knew or should have known that the child "victim's drug addiction, lack of supervision, and dependence on the defendant made the victim more susceptible to the defendant's conduct"); United States v. Wise, 158 F. App'x 173, 179 (11th Cir. 2005) (affirming application of vulnerable victim adjustment because the facts indicated that the defendant knew the victim lived in a retirement home, suffered from Parkinson's, and required assistance with her finances, which the defendant took advantage of by gaining the victim's trust and stealing from the victim's account). "In construing the 'otherwise particularly susceptible' language in section 3A1.1, we have held that circumstances, as well as immutable characteristics, can render a victim of criminal activity unusually vulnerable." United States v. Davis, 967 F.2d 516, 523 (11th Cir. 1992). The defendant need not "target" the victim nor know the precise source of the victim's vulnerability for the enhancement to apply. See United States v. Mathews, 874 F.3d 698, 706 (11th Cir. 2017) (citing United States v. Birge, 830 F.3d 1229, 1231–33 (11th Cir. 2016)); United States v. Smith, 853 F. App'x 589, 596 (11th Cir. 2021) (citation omitted).

Here, the child victim suffered from a vulnerable mental condition and circumstances, which she made extensive disclosures of to the defendant. The defendant admitted to law enforcement that he knew about her "depression issues," her several suicide attempts, the loss of her father,[1] and "traumatic incidences" the

---

[1] The defendant's knowledge of the child victim losing her father is not identified in the PSR. However, the defendant said he was aware the child lost her father in the same recorded interview he provided to law enforcement on March 27, 2024. Below is an excerpt of the interview, which the United States intends to seek admission of at the sentencing hearing:

LANIER: Okay? Um, tell me a little bit, how -- how well do you know [Minor Victim]?

GARRIGA: Um, pretty well. I mean, we're -- we first started, uh, working together in the, like, serving portion of the church.

LANIER: Okay.

GARRIGA: Um that's kind of how I got to know her and kind of got to know her story, uh, about -- just kind of her background and her life.

LANIER: Okay.

GARRIGA: Um, and then from there on then, just became friends.

LANIER: Okay. What kind of -- what is serving? What do you –

GARRIGA: Uh, like working in the -- doing service stuff in the church.

---

LANIER: -- anything like that. Um, and you said that you kind of got to know her, a little bit about her background. Tell me about that.

GARRIGA: Just the fact that, um, she lost her father, um, and she struggled with, uh, a lot -- I guess like a lot of like depression issues.

LANIER: Okay.

GARRIGA: Um, I guess there were some times that she tried to kill herself –

LANIER: Okay.

GARRIGA: -- or tried to OD, I think, on just pills and stuff, or some of her meds, 'cause she has, like, some type of um, [medical condition], I think, almost in a sense.

victim experienced, including rape. Doc. 68 ¶ 17. The defendant admitted the child "called him when she was having a difficult time," and that the defendant would then "talk her through just the difficulties she was going through." Id.[2] The 120 completed Facetime sessions between the defendant and child victim further

---

    LANIER: Okay.

    GARRIGA: Um, like kind of how my stepdaughter has. Um, so that's kind of how -- we kind of clicked on that. Um, but just -- just some things that she has struggled with, um, a lot with more of the depression and then just kind of just figuring out, you know, how to just basically maneuver through life. Um, and so we just, um, one day at church, just sat there and -- we sat there and talked, um, and -- while we were serving at the church and that's -- like I said, that's when I got to know, like, just her whole backstory.

    LANIER: Okay.

    GARRIGA: Just a lot of her struggles and stuff.

[2] During the March 27, 2024 interview, the defendant elaborated on how he would speak with the child victim in these types of conversations:

    LANIER: Tell me about any of those conversations. Like would she call you if she was having a difficult time or –

    GARRIGA: Yes, ma'am.

    LANIER: You know, when you said –

    GARRIGA: Yeah. We would talk outside of church as well, um, I mean, just anything from, you know, how's the day to, you know, the struggles that she was going through with her -- issues between her and her mom or, uh, just the issues of, uh, something as -- incidences that she's been a part of, like some of the traumatic incidences that she's been a part of. I guess she had, um, alleged that she had been raped –

    LANIER: Okay.

    GARRIGA: -- uh at one point. Um, so she said, like, some of those things were still bothering her or she would have, I guess, um -- I don't know. I wouldn't say like flare-ups, but she would have just, um, moments where I guess the incident would kind of like replay in her head again and –

    LANIER: Okay.

    GARRIGA: -- she would just be in tears. Um, so I would talk to her and, you know, just talk -- talk her through just the difficulties she was going through.

corroborate that they spoke often.  Id. at ¶ 11.  The defendant has not contested these facts.

In essence, the defendant admits that he cultivated an intimidate relationship with the victim through offering to serve as a sort of mentor and confidante for her most personal and private matters.  But, he now asserts, there is no "reason to believe" that the victim's mental state was "unusual" or made her "unusually vulnerable" to his enticement of her into illegal sexual contact over six months.  See Id. at 19 (defendant's objection letter).  Defendant eviscerates this position with his own words.  When asked how he got to know the victim and her background, the defendant immediately focused in on describing the child's traumatic past and emotionally vulnerable state.  See n.1.  He did not talk about how much the victim loves her dog, or what sort of music she is into, or what classes she is taking in high school, or anything else about her besides that she is emotionally vulnerable and dealing with a lot of trauma.  The defendant capitalized on the child victim's vulnerable mental condition by communicating with her in-depth about it as a means of garnering her trust so he could coerce her into an illegal sexual relationship that she never wanted.  The facts in the PSR alone establish the enhancement's application.

## II.   THE § 3553(a) FACTORS CALL FOR A GUIDELINES SENTENCE

The sentencing factors set forth in section 3553(a) call for a guidelines sentence.

a.  **Nature and Circumstances of the Offense**

The nature and circumstances of the offense exemplify predation by a stranger on a child. The defendant identified and pursued the child at church. Doc. 68 ¶ 8. When interacting with her there was not enough, he found her through the internet. Id. ¶ 9. After he contacted her, he proceeded to message her, call her, and visit her home. Id. ¶¶ 10–15. He sought her out. Again and again, the defendant made the choice to sexually pursue a child – one he knew was depressed and emotionally vulnerable. Id. And the defendant admits he was successful at making sexual contact with the child on more than one occasion. His guidelines properly distinguish this case as amongst the more serious enticement cases because there is a real victim and the defendant sexually exploited her – more than once. The persistent nature of the defendant's behavior in seeking out and harming a child weigh in favor of a guidelines sentence. Nothing about the nature and circumstances of the offense mitigate his intention, actions, and harm he caused.

b.  **History and Characteristics of the Defendant**

Contrary to the defendant's assertion (see id. at 20 (defendant's objection letter)), his law enforcement experience does not warrant a lower sentence. The defendant weaponized his position as a law enforcement officer to commit the crime. He used an undercover law enforcement Instagram account to contact the minor. Id. ¶ 9. He wielded his knowledge as law enforcement to cover his criminal activity by causing the victim to communicate on an encrypted platform and set the messages to delete after 24 hours. Id. He visited the child victim's home in his work vehicle and

8

sexually exploited the victim in it on several occasions. Id. at ¶ 12. He used his agency-issued cellular telephone to consume large amounts of media depicting young girls wearing revealing clothing and posed in sexualized manners. (Doc. 39 (government's 404(b) notice); 46 (denying defendant's motion to exclude child erotica at trial)).

During the entirety of the offense, the defendant carried a badge and authority with it. It would be bad enough had the defendant merely deliberately and repeatedly violated the law while he was sworn to uphold it, and it is even worse that he used law enforcement resources to carry out the crime. The Court therefore should decline his invitation to vary downward based on his employment.

    c.    **Unwarranted Sentencing Disparities**

A sentence within the guidelines avoids unwarranted sentencing disparities with other defendants. The United States Sentencing Commission's data analyzer reports that the average and median sentence length for individuals with a primary guideline of USSG § 2G2.1 is 272 months (average) and 256 months (median):[3]

---

[3] This is public information for fiscal year 2023 available at: https://ida.ussc.gov/analytics/saw.dll?Dashboard. Please note that the participant must identify the "Primary Guideline" as USSG § 2G2.1.



The average and median sentences across the country under § 2G2.1 are slightly lower than the defendant's guideline range here of 292 to 365 months. However, given the four enhancements that apply here based on the unique facts of this case, a guidelines sentence would comport with the average and median sentences because the aggravating factors support a sentence above the average and median sentences.

## CONCLUSION

The final PSR correctly calculates defendant's guidelines range as 292–365 months. There is no compelling reason to vary from the guidelines, which reflect the seriousness of the offense and the harm done to the child victim in this case. A

sentence within the guidelines is sufficient, but not greater than necessary, to achieve the statutory purposes of sentencing.

                    Respectfully submitted,

                    ROGER B. HANDBERG
                    United States Attorney

By: */s/Laura Cofer Taylor*
     LAURA COFER TAYLOR
     Assistant United States Attorney
     USA No. 170
     E-mail:   laura.c.taylor@usdoj.gov

     KELLY S. MILLIRON
     Assistant United States Attorney
     Florida Bar No. 1018917
     E-mail:   kelly.milliron@usdoj.gov

     300 North Hogan Street, Suite 700
     Jacksonville, Florida 32202-4270
     Telephone:       (904) 301-6300
     Facsimile:         (904) 301-6310

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2024, I filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

> Alan Ceballos, Esq.
> *Counsel for Defendant*

> /s/ Laura Cofer Taylor
> LAURA COFER TAYLOR
> Assistant United States Attorney